IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

ELAINE WITTY,

                Plaintiff,                Case No. 3:11 CV 662

-vs-

                                       <u>MEMORANDUM   OPINION</u>

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

KATZ, J.

Plaintiff Elaine M. Witty filed a complaint against defendant Commissioner of the Social Security Administration protesting the Commissioner's denial of disabilities benefits. (Doc. 1.) This matter is now before the Court on United States Magistrate Judge James R. Knepp II's Report and Recommendation that the Court affirm the Commissioner's decision (Doc. 20) and Ms. Witty's objections to that report (Doc. 21). Following a *de novo* determination of those of the Magistrate Judge's findings to which Ms. Witty objects, the Court rejects Ms. Witty's objections and adopts the R&R. 28 U.S.C. § 636(b)(1); *Ivy v. Sec'y of Health & Human Servs.*, 976 F.2d 288, 289-90 (6th Cir. 1992) (defining the district judge's role: "[T]he judge makes a *de novo* review of the pertinent record; considers carefully the magistrate judge's report and recommendation; and then indicates his or her reasons, as briefly, succinctly and reasonably expressed as the case requires, for the court's decision." *Id.*).

I. BACKGROUND

The R&R accurately recites and summarizes Ms. Witty's work history (Doc. 20 at 1-3); Ms. Witty's medical history (*id.* at 3-10); the two doctors' opinions of Ms. Witty's residual functional capacity (RFC) (*id.* at 10-13); and the administrative hearing and  decision (*id.* at 13-20). The Court adopts these sections in their entirety.

Briefly, Ms. Witty is now 51 years old and suffers from, among other things, morbid obesity, degenerative joint disease in her knees, hypertension, gastro-esophageal reflux disease, and edema secondary to right heart failure. (Tr. at 19.) She says she is disabled because swelling and pain limit her ability to sit, stand, walk, lift, reach, and bend. (*Id.* at 249-52.) She also says she must elevate her legs at an incline for ninety minutes every four to six hours. (*Id.* at 259-61.) Until 2003, Ms. Witty worked as a medical assistant, a position she left for reasons unrelated to her disability (*id.* at 63), and has occasionally held similar positions on a contract basis since (*id.* at 242-46). She says that her disability onset date was October 26, 2005. (*Id.* at 62.)

Ms. Witty applied for supplemental security income (SSI) and the defendant Commissioner of Social Security denied the claim on her application and upon reconsideration. (Tr. at 17.) Ms. Witty requested and obtained a hearing, following which the ALJ found that Ms. Witty had two severe impairments and several non-severe impairments. (*Id.* at 19.) In determining Ms. Witty's residual functional capacity (RFC), the ALJ discounted the weight attributed to her treating physician's opinion that she needed to stop work every four to six hours and elevate her legs for ninety minutes because the evidence in the record did not support that restriction. (*Id.* at 22.) This led to the ALJ's conclusion that Ms. Witty had an RFC and some transferable job-related skills and that Ms. Witty was not disabled as defined by the Act. (*Id.* at 26.) The Social Security Appeals Council denied Ms. Witty's request for review of the ALJ's decision. (*Id.* at 3.) Following the denial, Ms. Witty timely filed a complaint against the Commissioner (Doc. 1), over which this Court has jurisdiction. 42 U.S.C. § 405(g). The Court referred the case to the Magistrate Judge for a Report and Recommendation, Local Rule 7.2(b)(2), in which the

Magistrate Judge recommended affirming the ALJ's decision. (Doc. 20.) Ms. Witty timely filed an objection to that (Doc. 21) and the Commissioner relied on its previous brief (Doc. 18).

## II. OBJECTIONS

Ms. Witty narrows her objection to two questions: whether the ALJ gave the proper weight to the opinion of Ms. Witty's treating physician, Dr. Darrell A. Hall, when the ALJ found that Ms. Witty was not restricted to elevating her legs for 1.5 hours every four to six hours; and whether the ALJ was proper in finding Ms. Witty's skills were transferable without considering whether her limitations would reduce the transferability of the skills.

### A. THE WEIGHT GIVEN TO DR. HALL'S OPINION

A few days prior to the ALJ hearing, Dr. Hall wrote to Ms. Witty's counsel:

> I am writing this letter at the request of the patient as referenced above. She informed me that she has a hearing in the near future and that you had questions regarding the criterion by which she was expected to have elevated her legs as part of the treatment regimen geared toward assisting her with drainage of lower extremity lymphedema which has accumulated for quite some time. Specifically, you asked whether there was a set height, and amount of time for this to be done. Your suggestion of 90% with 1.5hr intervals, with the legs above the heart gives me an idea of what you are expecting but the next questions [sic] 90% of what? And I have been having trouble also trying to come up with an optimal height and frequency in which the intervals should occur daily. As I spoke with her today about it today [sic] and it appears that elevation of the foot of the bed (or her feet should she not be able to elevate the bed) between 15 and 30 degrees from the normal, while lining [sic] supine (on her back in a supine position) at 1.5hr intervals at a frequency of every 4 to 6 hours should help to provide therapeutic means of decreasing the lymphedema in a measurable fashion on a daily basis. And this could help to remove some of the excess if done consistently in a similar manner. I think this line of reasoning will help to support the patient's case.

(Tr. at 201.) Ms. Witty also says that she needs to elevate her legs in order to relieve leg swelling. (Tr. at 259-60 (Witty direct examination).) The ALJ discounted Dr. Hall's opinion on this restriction, saying the medical record did not support it because the record lacked findings that

3

would indicate such a restriction. (*Id.* at 23.) The ALJ further noted that Ms. Witty's own testimony conflicted with Dr. Hall's restriction because she said she needs to elevate her legs twice each day, from 11-12 p.m. and from 6 – 8 p.m. (*Id.*; *id.* at 259-60.)

Other than Dr. Hall's letter, written on the eve of the ALJ hearing and to "support the patient's case," (Tr. at 201), the record lacks an indication of this restriction. In January 2008, Dr. Hall saw Ms. Witty; wrote, among other things, "Peripheral/Edema_or_Varicosities not detected;" diagnosed her with five conditions, none of which was edema, lymphedema, or leg swelling; and created a plan that did not include leg elevation. (*Id.* at 198.) Dr. Hall's progress note following Ms. Witty's February 2008 visit is the same. (*Id.* at 199.) Around October 2008, Dr. Hall completed a medical form for the Lucas County Department of Job and Family Services in which he did not list edema, lymphedema, or leg swelling as a condition and did not note the need to elevate the legs as a limitation. (*Id.* at 190-91.) Similarly on a March 2009 Social Security Administration Medical Source Statement, Dr. Hall listed morbid obesity as causing Ms. Witty's physical limitations but did not mention edema, lymphedema, or leg swelling and did not mention the leg elevation restriction.

The record contains several indications that Ms. Witty suffered from edema (the general term for abnormal fluid accumulation in the body). (Tr. at 127 (Cardiologist's progress note including the impression, "Edema secondary to right heart failure, probably secondary to sleep apnea."); *id.* at 173 (Dr. Williams' progress note diagnosing, "+2 edema and crepitus."); *id.* at 159 (Physical therapist Mary Berg's initial evaluation noting that Ms. Witty was "referred to the Lymphedema Clinic by Dr. Hall with a diagnosis of Edema and Stasis of her bilateral lower extremities.").) Yet none of these indicates a diagnosis of the more specific "lymphedema." The

4

closest indication to a lymphedema diagnosis is the physical therapist's note that Ms. Witty, "presented with Stemmer's sign," (Tr. at 159) which Ms. Witty herself calls, "a sign diagnostic of lymphedema," (Objection, Doc. 21 at 3). Thus, when Dr. Hall wrote in August 2009 that the leg elevation was "geared toward assisting her with drainage of lower extremity lymphedema which has accumulated for quite some time," (*Id.* at 201), it is not supported by the record.

Furthermore, even if Ms. Witty actually had lymphedema, the Magistrate Judge correctly points out that the record does not support leg elevation as a restriction because the physical therapist presented Ms. Witty with various other management options:

> The therapist at the Lymphedema Clinic recommended a variety of treatment options, ranging from self-massage, exercise, and bandaging to a more-expensive Circaid system. (Tr. 154). Plaintiff reported doing self-massage and exercise but was unable to properly bandage her legs, and her daughter did not consistently help her do so. (Tr. 154, 156–57). When Plaintiff's legs were bandaged, she stated they felt better (Tr. 157), and Plaintiff testified she still wraps her legs (Tr. 262). Instead of recommending leg elevation, Dr. Hall recommended a compression pump to Plaintiff's daughter. (Tr. 157). This variety of treatment options – including simple bandaging, which Plaintiff stated helped her legs – shows leg elevation is not the only way to treat Plaintiff's lymphedema, contradicting Dr. Hall's elevation opinion and also rebutting Plaintiff's argument that Dr. Hall's opinion regarding lymphedema is the only such opinion in the record.

(Doc. 20 at 27 (R&R).)

In fact, Dr. Hall's August 2009 letter does not even read as an opinion restricting Ms. Witty to elevate her legs. It refers to leg elevation as "part of the treatment regimen geared toward assisting her with drainage of lower extremity lymphedema which has accumulated for quite some time." (Tr. at 201.) Nowhere does the letter state the leg elevation is an actual restriction or that it is based on a medical diagnosis. The stated purpose of the letter itself is to inform Ms. Witty's counsel how she should go about the leg raise (how long, how often, how much tilt). It gives the reader the impression that the original source of the leg elevation advice is something other than

5

this letter, such as a progress note, a conversation in which it was recommended, or a pamphlet about best practices in managing conditions like Ms. Witty's. The letter, unsupported by any indication in the record of the diagnosis or restriction, does not read as a restriction necessarily imposed on Ms. Witty, and instead just reads as a set of instructions Ms. Witty should follow if she utilizes leg elevation as a therapy.

Even if the August 2009 letter could be read as Dr. Hall's opinion that Ms. Witty must follow a particular leg elevation regimen due to a diagnosis, Ms. Witty has not presented the Court with an indication that the ALJ erred in the weight he gave this opinion. "An ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in [the] case record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)). When the ALJ discounts the treating physician's opinion, he must give specific reasons, supported by record evidence, for choosing a lesser weight. *Id.* The ALJ explained that he declined to give "great weight" to Dr. Hall's opinion because Dr. Hall's own observations and other record evidence did not support it. (Tr. at 23.) Ms. Witty has pointed to no diagnosis or other evidence in the record indicating this restriction was medically required or even that Dr. Hall actually required it. Thus, Ms. Witty has not met the burden of showing that the ALJ's decision to discount the weight of Dr. Hall's leg elevation opinion was made erroneously.

The ALJ noted inconsistencies between Ms. Witty's testimony and the purported leg elevation restriction as an additional reason to discount that restriction. (Tr. at 23.) The Court agrees with Ms. Witty; her claim that she elevates her legs between 11 and 12 p.m. and again

6

between 6 and 8 p.m. in answer to the question, "when do you elevate them?" (Tr. at 260-61) is not wholly inconsistent with a requirement to elevate for 90 minutes every four to six hours. Nevertheless, this was just an additional reason given by the ALJ for discounting the opinion of Dr. Hall. Furthermore, the record supports the ALJ's findings notwithstanding this point and the Court can uphold a finding when it is based on substantial evidence even where it would have made a different determination as to one, albeit minor, point. *Kyle v. Comm'r Of Soc. Sec.*, 609 F.3d 847, 854-55 (6th Cir. 2010) ("Even if this Court might have reached a contrary conclusion of fact, the Commissioner's decision must be affirmed so long as it is supported by substantial evidence."). Substantial evidence supports the ALJ's determination of the weight to give to Dr. Hall's opinion and the resulting determination of Ms. Witty's RFC.

### B. THE VOCATIONAL EXPERT'S TESTIMONY

In step five of the disability analysis, the ALJ must decide whether the Commissioner can demonstrate that the claimant is able do other work considering her residual functional capacity (that is, her remaining ability to perform tasks with limits imposed), her age, her education, and her work experience. *Kyle*, 609 F.3d at 855; 20 C.F.R. § 404.1520(g)(1). Part of this analysis involves ascertaining whether skills obtained in past work will transfer to other work. "The claimant is considered to have transferable skills when skilled or semi-skilled work activities the claimant did in past work can be used to meet the requirements of skilled or semi-skilled work activities of other jobs or kids of work." *Kyle*, 609 F.3d at 855-56; *see also* 20 C.F.R. § 404.1568(d)(1)-(3); SSR 82–41. The ALJ must consider the claimant's functional limitations in his transferability assessment. SSR 82-41.

Ms. Witty says that the ALJ erred in not asking the vocational expert to reconsider whether her previously acquired skills would be transferable in light of the limitations the ALJ identified. (Objection, Doc. 21 at 8.) Ms. Witty, however, misstates the applicable regulation. Social Security Ruling 82-41(4)(b) does not say that the vocational expert *himself* must consider the claimant's limitations when he testifies about what skills transfer from the claimant's past relevant work to other jobs. Instead, it says: "All functional limitations included in the RFC (exertional and nonexertional) must be considered in determining transferability." SSR 82-41. In this case, the ALJ used the vocational expert's testimony to ascertain which of skills that Ms. Witty obtained from her past relevant work were transferable. (Tr. at 277.) Then the ALJ himself determined which of those actually transferred when expressly considering Ms. Witty's RFC. (*Id.* at 25.) Case law supports this. *Kyle*, 609 F.3d at 855 ("The ALJ can also use the services of a VE to help determine whether a claimant's work skills can be used in other work, and, if so, the specific occupations in which they can be used. . . . The ALJ must then assess whether the claimant has transferable skills . . . ."). Ms. Witty has not provided the Court with case law or regulations requiring the vocational expert himself to consider the claimant's limitations when determining the transferability of skills.

Ms. Witty says the vocational expert was inferring or implying that some of her skills may not transfer. (Objection, Doc. 21 at 8-9.) This is, however, a strained reading of the transcript. While considering the hypothetical limitations ultimately found by the ALJ and talking about the transferability of Ms. Witty's skills, the ALJ asked: "Would any of those jobs be available to a person with the limitations as in hypothetical number two?" (Tr. at 281.) The vocational expert answered: "Yes, your honor," and proceeded to list job classifications. (*Id.*) If Ms. Witty's counsel

thought the vocational expert was inferring or implying that some of her skills were not transferable, he did not seek clarification during cross-examination. (*Id.* at 282-89.) With evidence from the vocational expert supporting it and no evidence to the contrary, substantial evidence supported the ALJ's determination of which skills were transferable and it was not in error.

III. CONCLUSION

For the reasons stated herein, the Court rejects Ms. Witty's Objection (Doc. 21) and adopts the Magistrate Judge's Report and Recommendation affirming the Commissioner's denial of disability insurance benefits (Doc. 20). Case closed.

IT IS SO ORDERED.

    s/ *David A. Katz*
DAVID A. KATZ
U. S. DISTRICT JUDGE